HEATHER E. WILLIAMS, #122664
Federal Defender
DOUGLAS J. BEEVERS, #288639
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814
Telephone: (916) 498-5700
Douglas_Beevers@fd.org

Attorneys for Defendant
KYLE COLTON

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  2:24-cr-00029-DAD |
| Plaintiff, | **MOTION TO SUPPRESS** |
| v. | |
| KYLE COLTON, | |
| Defendant. | |

The Defendant, KYLE COLTON, moves the Court to suppress all evidence discovered pursuant to a warrant that authorized the search and seizure of Mr. Colton's cellular phone, his residence, and his personal computer found within his residence based on a lack of probable cause due to both staleness and insufficient factual nexus.  Mr. Colton also asks for a *Franks* hearing to determine whether the affidavit contained reckless omissions which would have been relevant to the U.S. Magistrate's determination of probable cause.

## I.   Factual Background

The affidavit in support of the search warrant in this case correctly established that Mr. Colton trespassed at the Capitol on January 6th, 2021, and the CCTV footage showed that he used a phone to photograph or videotape his time in the Capitol building. Ex. A: Search warrant affidavit page 1 (hereinafter SW-1).  Although the affidavit in support of the search warrant was submitted in December 2023, the FBI had solved this trespass with conclusive evidence by February 2021 thirty months earlier.

The day after the January 6th riot, FBI agents interviewed two witnesses who reported that the passenger in seat 13D on Delta flight 5739 on January 7, 2021 admitted trespassing in the U.S. Capitol on January 6, 2021. The F.B.I. immediately obtained the flight manifest from Delta which conclusively identified Kyle Colton as the passenger in seat 13D. See Ex. B: Grand Jury Subpoena Request to USAO; Ex. C: FBI Reports dated 1/11/2021.  One witness reported the passenger showed a video on his phone and claimed he took it inside the U.S. Capitol. *Id.* These two witnesses were interviewed in depth on January 11, 2021. Ex. C-D.  According to the search warrant affidavit, by January 2021, FBI received through legal process confirmation from Delta airline flight manifests that Kyle Colton was the passenger in seat 13D who admitted to two other passengers that he had trespassed in the Capitol on January 6, 2021. Ex. A: SW-15.

The search warrant affidavit advised the judge that in July 2021 the F.B.I. found pictures Kyle Colton had taken inside the Capitol and sent by phone to another protester in a text attachment.  Ex. A: SW-17, 18.

The search warrant affidavit did not mention that on April 27, 2021, FBI agents contacted Kyle Colton at his residence at Yarrow Way, Citrus Heights, CA, where they confirmed his identity from DMV records and advised him that they wanted to ask questions, but he refused to speak with them. Ex. E: FBI report dated 4/27/2021.  On the same day the F.B.I. verified his

phone number and his voicemail confirmed the number 916-272-36## as being Kyle Colton's.

The affidavit included screen shots taken from the CCTV cameras which clearly showed Mr. Colton at the U.S. Capitol protest and photographs of Mr. Colton inside the Capitol wearing a Trump 2020 campaign flag as a cape. Ex. A: SW-20, 21.  The affiant misleadingly describes this Trump 2020 campaign flag as a "distinct royal blue, white and red flag." Ex. A: 18-19.  The affiant must have known this Trump 2020 flag was not distinctive, because it was flown by thousands of Trump supporters in Sacramento where the affiant was working the case, and is visible on the January 6th CCTV camera footage carried and worn by several hundred of the protestors.  The affiant chose pictures of Mr. Colton at the Capitol which did not show the banner's details and omitted screenshots which would have clearly advised the U.S. Magistrate that this was one of the millions of $5 Trump flags which were possessed by the millions of people who supported Trump's candidacy. See E. O: Screen shots.  The affidavit also falsely claimed that "(P)eople routinely keep items like the distinct royal blue, white and red flag tied around the bottom half of his face for years or even decades." Ex. A: SW-30 para. 56.  This statement is clearly false because Trump's first banners date from his 2016 campaign and there is no way for the agent to know how many of the millions of Trump voters kept these cheap single election banners.  This description of the banner as distinctive was particularly misleading, because many flags carried at the January 6th riot were distinctive and suggested involvement with violent racist movements such as the Kek flag, the Confederate battle flag or the Gasdsen flag. See Ex. N: Wall Street Journal Article on Distinctive Flags [1]  The affidavit falsely describes his attire as "distinctive" even though it is just a common black watch cap, black jacket and blue jeans.

The affidavit also falsely claimed that Mr. Colton participated in an assault on a police

---

[1] In contract to this Trump banner which was possessed by millions of Americans, the well-known distinctive Hells Angels Banner and logo are associated with an organization with only 6000 members.

officer with a flagpole.  The affidavit states:

> At one point COLTON grabbed a flag pole that was being used by a rioter to assault MPD Officer K.D.  COLTON gained control of the flagpole, which Officer K.D. had also grabbed and then gave it back to this rioter who then fled into the crowd of rioters with the flagpole.

Ex. A: SW 27-28.  The body camera video shows Mr. Colton was not involved in any assault of giving a flagpole back to a violent rioter.  The video shows he merely pushed the flagpole away from his own face to protect himself and pushed it down.  The video clearly shows no evidence of Mr. Colton doing anything to assist the person committing the assault or anything that could be considered violent. See Ex. L: Body Camera video clip.

This misleading paragraph was the only description of any acts which could be a felony. The affidavit claimed probable cause for only one felony, obstruction of law enforcement under 18 U.S.C. § 231 which requires proof that Mr. Colton knowingly committed an act with the "specific intent to obstruct law enforcement officers." *United States v. Grider*, 651 F.Supp.3d 1, 13 (D.D.C. 2022)(describing the elements on 18 U.S.C. § 231 in a January 6th trial case). This misleading paragraph was the only evidence that Mr. Colton committed the misdemeanor of disorderly conduct in violation of 18 U.S.C. § 1752, which requires proof that a defendant engaged in conduct likely to cause a public disturbance or caused another person to be in reasonable fear that the person would be harmed or that it would be disruptive under the circumstances. *See United States v. Alford*, 89 F.4th 943, 950 (D.C. Cir. 2024)(upholding on appeal the prosecution's definition of disorderly conduct which had been used in many January 6th disorderly conduct prosecutions prior to the date of Mr. Colton's search).

The December 2023 search warrant affidavit advised the magistrate judge that "many individuals committing the (January 6th) Offenses kept and posted videos, photos, and commentary about their participation in these offenses, essentially bragging about their participation." Ex. A: SW.  However, the affidavit failed to mention that by July 2021 the FBI

had already verified that Kyle Colton's phone number was not associated with any social media accounts. Ex. G: FBI report.

By July 2021, D.C. U.S. Attorney's Office already had overwhelming evidence to prove that Kyle Colton had trespassed inside the U.S. Capitol, and was clearly caught on CCTV security cameras inside the Capitol, and had confessed to the crime to two passengers on a Delta flight which had conclusively confirmed his identity and there was solid evidence that he had emailed photos from inside the Capitol to another suspect.  Despite all this overwhelming evidence, the U.S. Attorneys and FBI waited an additional 29 months before seeking a search warrant for the phone that had been used during the trespass.  During the 29-months delay, over 1,000 January 6th defendants were arrested with substantial publicity for crimes similar to those Mr. Colton had been questioned about in April 2021.  In November 2022, the Sacramento Bee reported that prosecutors were seeking prison for a Rocklin man who pled guilty to obstruction of the election. Ex. H: Sacramento Bee article.  One year after the Capitol incident, the local news TV station KCRA reported on the 6 Sacramento area defendants. Ex. I.  According to the U.S. Attorneys for the District of Columbia press releases 935 defendants had been charged with trespassing on Capitol grounds by July 5, 2023.  Ex. J: DOJ July 2023 press release.  By the summer of 2023, 160 defendants pled to felonies and 434 had pled to misdemeanors, and 335 defendants had received prison sentences. *Id*.

The affidavit sought Mr. Colton's phone, his Trump 2020 flag, and the ordinary clothes he wore inside the Capitol.  The affidavit also sought permission to seize and search Mr. Colton's computers if he was found to have any computers.

The probable cause listed for searching his computer was simply the affiant's claim that:

"in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices. Thus, there is reason to believe that evidence of the

offense that originally resided on COLTON's cell phone may also be saved to other digital devices on the premises."

Ex. A: SW-33.   The affidavit contained no evidence to suggest that Mr. Colton owned a computer.

The affiant's conclusory statement that backing up files from a phone to computer is "common" for "people" is false. Survey Data collected from by Avast Digital Security estimates that 44% of Americans do not back up their devices at all.  Ex. K: Avast Data.  Of those who do back up their devices, approximately half of users do so use an online cloud storage service.  In contrast, only 21% of users backed their phones up to a personal computer, equivalent to about 11% of Americans in total.

The affidavit also misleadingly stated that:

> "As widely reported in the news media related to this matter, many individuals committing the Target Offenses kept and posted videos, photos, and commentary about their participation in these offenses, essentially bragging about their participation. Based on that, there is also probable cause to believe that evidence related to these offenses may have been transferred to and stored on digital devices beyond the particular digital device COLTON possessed during the offenses."

Search warrant affidavit p. 34. This statement was misleading, because the F.B.I. had already verified that Mr. Colton's phone number was not associated with any social media accounts. See Ex. G.

The affidavit also misleadingly claimed that it was seeking the "distinctive" flag Mr. Colton wore in the CCTV camera videos of the riot, and the affiant claimed to know that: "People typically keep items like the distinct royal blue, white and red flag tied around the bottom half of his face for years or even decades." Ex. A: SW-30.   This statement was misleading, because the CCTV footage clearly shows that the distinctive flag was a Trump 2020 election flag which could not have been kept for decades by anyone.  See Ex. O: Screen shots. The affiant reported that "hundreds of people had been arrested in connection to the riot that

occurred at the U.S. Capitol" and clothing or other items used or carried were found in the majority of cases. SW-31.  The affiant reported ten examples in late 2023 in which clothing "believed to be evidence" was found in a search of a residence, but in only two of these examples was the evidence distinctive election paraphernalia – a sign and a blue Trump hat. The affiant did not mention whether either of these defendants had been questioned as Mr. Colton had. The bulk of the evidence discovered in these late search warrants included only ordinary non-descript clothing and backpacks which remained useful for years and very expensive items such gas masks, helmet and body armor.  The CCTV video clearly shows Mr. Colton did not have any gas mask, helmets, or body armor during his trespassing in the Capitol.  The affidavit does not mention the fact that 74 million Americans voted for Donald Trump and the allegedly distinctive Trump 2020 flag which Mr. Colton wore during his crime was actually the official Trump Campaign Banner and only cost about $5.00 on Amazon.  The affiant also does not mention that on the January 6th CCTV footage as many as 1,000 of these banners are seen being flown by the over 50,000 Trump supporters who were present that day.  The description of the Trump 2020 flag as distinctive is misleading, because there was substantial press about other flags which were distinctive.

Mr. Colton's phone was found on his person when he was arrested and the photos he took inside the U.S. Capitol were still on the phone.  Mr. Colton's phone was not connected to seamless uploading system.  In a search of Mr. Colton's residence, law enforcement found several computers and identified one as Mr. Colton on which child pornography was discovered.

## II.    Legal Standard

In reviewing a search warrant, "a magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates* 462 U.S. 213, 236 (1983).  *See*

*Millender v. County of Los Angeles*, 620 F. 3d 1016, 1024 (9th Cir. 2010).  "Deference to the magistrate, however, is not boundless."  *United States v. Leon*, 468 U.S. 897, 914 (1984).  Courts should not "defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'"  *Id.*  At 915 (quoting *Gates*, 462 U.S. at 239); *See United States v. Clark¸* 31 F. 3d 831, 834 (9th Cir. 1994).  An affidavit of probable cause must also "establish a reasonable nexus between the crime or evidence the location to be searched."  *United States v. Crews*, 502 F.3d 1130, 1136-37 (9th Cir. 2007).  In establishing a nexus, "a magistrate's determination of probable cause cannot be a mere ratification of the bare conclusion of others.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  For example, wholly conclusory statements made by law enforcement officers such as "I believe" or "cause to suspect" fail to meet this requirement.  *Id*.

The Ninth Circuit cautions against issuing warrants that are overbroad, stating the scope of a warrant must "never include more than is covered" by that probable cause.  *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980).  This is a particularly salient issue in cases of search warrants for Electronically Stored Information (ESI), because electronic devices are capable of storing vast amounts of information and it is difficult to cabin a search only to evidence of an alleged crime because all the information is stored together.  To balance the competing interests of maintaining Fourth Amendment protections and allowing law enforcement to gather evidence, the court demands "greater vigilance" in approving searches of ESI and cautions specifically against "permitting inferences that aren't supported by clear facts."  *See United States v. Comprehensive Drug Testing, Inc.,* 621 F.3d 1162, 1172 (9th Cir. 2010) (CDT), overruled in part on other grounds as recognized by *Demaree v. Pederson,* 887 F.3d 870, 876 (9th Cir. 2018) (per curiam).

## III.    Legal Argument.

The search warrant should be found invalid for four reasons. First, the warrant was stale as it was executed close to three years after a single incident of misdemeanor trespass was committed 1,000 miles away.  Second, the probable cause statement relies on statements that mischaracterize computer processes and the evidence to establish probable cause. Next, even if the affiant's statements are presumed true, they are wholly conclusory statements and boilerplate assertions that fail to establish any kind of factual nexus between Mr. Colton's activities on January 6th and the location to be searched.  Third, the warrant issued based on inaccurate descriptions of the evidence which were at least reckless and should be stricken from the warrant.  The search warrant should be found invalid, and the evidence must be suppressed as the good faith exception does not apply where similar warrants had been struck down in the same district.  This brief will address each of these issues in turn.

### A.  When the Search Warrant Was Issued and Executed it Was Stale.

The Ninth Circuit has held that there cannot be probable cause for a search warrant without timeliness, and proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.  *Sgro v. United States*, 287 U.S. 206, 210 (1932).  The Ninth Circuit has held that "the facts must show that the property to be seized was known to be at the place to be searched so recently as to justify that the property is still there at the time." *Durham v. United States*, 403 F.2d 190, 194 (9th Cir. 1968).  In *Durham*, the Court held that a delay of four months made the application stale where there was no evidence of continued criminal activity.  In *United States v. Lacey*, the Court found that a ten-months delay was not stale where the affiant had provided good reasons to believe the visual depictions downloaded were still on computers in Lacy's apartment, because the affiant had

stated that "based on her training and experience as a Customs agent" that "collectors of child pornography value their sexually explicit materials highly" rarely if ever" dispose of such material and store it "for long periods of time." *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997).  In *Lacy* the Ninth Circuit relied on *United States v. Rabe*, 848 F.2d 994 (9th Cir. 1988) which held that a magistrate issuing a warrant may rely on the affiant's expert opinion.  The affidavit in Mr. Colton's case did not provide an expert opinion that  January 6th protesters valued their photos of inside the Capitol in the same obsessive way that persons who collect child pornography value the sexually explicit materials.  By 1995 when the *U.S. v. Lacy* case warrant issued, U.S. Customs had years of experience investigating thousands of child pornography cases, whereas in 2023 when Mr. Colton's warrant issued, the F.B.I. had very little information about what the psychological make up was for persons who trespassed in the Capitol.  Although law enforcement officers today may be able to provide expert opinions about certain crimes, such expertise cannot be gained in one investigation of one crime such as the January 6th riot.

The Ninth Circuit held that a 20-month delay rendered a warrant stale where the suspect had been contacted by law enforcement regarding the contraband. *United States v. Weber*, 923 F.2d 1338 (9th Cir.1991) (order and amended opinion). In *Weber*, the Ninth Circuit held that a warrant for child pornography was invalid and found that the purported expert testimony that "child molesters," "pedophiles," and "child pornography collectors" would keep such materials in their houses for long periods of time was not relevant to a showing of probable cause because no evidence was presented that Weber fell into one of the identified categories. *Id*. at 1345.

In *Greany*, the Ninth Circuit explained that longer lapses of time do not make a warrant stale if the "evidence sought is of an ongoing criminal business of a necessarily long-term nature…rather than a completed act." *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991).

The Ninth Circuit held that staleness must be evaluated in light of the particular facts of the case and the nature of the criminal activity and property sought. *Id*. In *Greany*, the court upheld a warrant for an indoor marijuana grow based on evidence from a cooperating informant who claimed to have helped remodel the house into a clandestine marijuana farm three years earlier and that he had seen the operation two years earlier.  In *Greany* the Ninth Circuit also noted that the fact that the owner of the property was not aware of the investigation was a factor which weighed against staleness and made continued presence of the evidence more likely. *Greany, supra,* at 525-526.   In Mr. Colton's case the fact that he had been made aware of the investigation by national news coverage of other similar cases and a visit from the F.B.I. which had scared him was highly relevant evidence making it unlikely that Mr. Colton would keep a $5.00 Trump 2020 flag or his photos from inside the Capitol.  Unlike child pornography or a marijuana grow house, Mr. Colton's photos inside the Capitol were valueless even to him, because they were indistinguishable from the thousands of photos other people had taken and posted on the internet.

The Ninth Circuit has held probable cause to search a residence does not automatically follow from probable cause to believe a suspect is guilty of a crime. *United States v. Valenzuela*, 596 F.2d 824, 828 (9th Cir.1979), cert. denied, 441 U.S. 965 (1979).  Probable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home. 2 *Search & Seizure: A Treatise On The Fourth Amendment*, LaFave, Wayne R. | § 3.7(d) (6th ed.) 2024.

The Ninth Circuit has explained that in evaluating probable cause for search warrants, evidence that someone is involved in "a large-scale ongoing criminal organization not evidence relating to a completed criminal act" is a factor which permits a longer lapse in time to not be stale in warrants for ongoing large-scale criminal activities. *United States v. Foster*, 711 F.2d

871, 878 (9th Cir. 1983).

In contrast with ongoing crimes in *Foster*, and *Greany*, Mr. Colton's activity at the Capitol was not an ongoing criminal enterprise, it was a completed act. It took place in a period of less than two hours and there is no evidence whatsoever suggesting Mr. Colton was engaged in any further trespasses anywhere or any incidents of disorderly conduct. The fact that Mr. Colton's alleged trespass was a completed act, that he was informed the FBI were investigating him for it, and that it happened nearly three years prior to the search warrant's execution indicate the information underlying probable cause was stale and the warrant was no longer valid.

The fact that the warrant was executed years after the F.B.I. had conclusively solved the trespassing case against Mr. Colton, combined with fact that the warrant sought to search computers that there was no evidence he even owned, strongly suggests that this warrant was a fishing expedition which hoped to find evidence of other more serious crimes beyond the crimes they had probable cause for.

**B. The Affiant's Statements Contain Inaccuracies and Mischaracterizes Computer Processes.**

The search warrant for Mr. Colton's residence contained inaccuracies and misstatements. The affiant states that in his training and experience, it is common for individuals to back up or preserve copies of digital media across multiple devices to prevent loss. The government states no specific facts that to suggest Mr. Colton had a computer or used his computer in connection with the alleged trespass or backed up any photos or videos onto it. The only support in the mentioned for this claim is the affiant's training and experience that backing up devices is "common" behavior. First, the law enforcement officer's use of "common" is vague as to the actual frequency of such behavior or whether individuals back up their phones to their computers enough to make it probable that Mr. Colton would do so. The affiant does not clarify whether common is for all Americans or trespassers or January 6th protesters.

The affiant also states that the fact that "some companies provide services that seamlessly sync data across devices" as evidence that digital media from Mr. Colton's phone was saved to other digital devices.  The affiant does not that the use of such services is "common," whether they are provided automatically, whether they require setup by the user, what requirements there are, or most importantly, whether such services were available to Mr. Colton.  This statement only asserts that such services exist; it does not serve to establish a nexus to Mr. Colton's computer because there is no evidence indicating he backed up his phone to his computer. Furthermore, the affiant's assertion that cross-device is syncing is "seamless" is misleading. Most syncing services, which utilize cloud storage, require that the devices have compatible operating systems, be compatible with the same cloud service, have each device is registered with the cloud service by the user, and be active and syncing in order for digital media to be accessible from another device.  All these conditions must occur before the "seamless syncing" described by the affiant can take place.  The only syncing service which automates any of these processes is Apple Inc.'s iCloud service which Mr. Colton did not use as he did not have Apple Products.

Mr. Colton owned a Huawei phone, and his computer was an HP laptop which are manufactured by two different companies; this means there is no inherent sync communications between such devices.  Mr. Colton's phone brand, Huawei, is a Chinese brand phone that uses its own operating system, app store, and unique system protections.  Since this is a foreign company with an uncommon operating system, there are limited cloud storage services that are compatible.  It would be very difficult and take a very technologically savvy person to set up syncing between two such devices, which is certainly not a basis to believe it is probable that the digital content from Mr. Colton's cell phone would be present on other digital devices as the affiant claims.

-13-

The affiant also states that many individuals involved in the target offenses posted videos, photos, and commentary about their participation. The affiant suggests that this fact is a sufficient factual basis to suspect Mr. Colton also posted online about the alleged trespass and as a result digital evidence was transferred to other digital.  There are several issues with this line of reasoning. First, the use of "many" is vague—there is no actual value to what percentage of suspects posted on social media. Second, this is yet another broad generalization; the affidavit provides no evidence that Mr. Colton posted on social media.  The mere fact that other people posted on social media is not a sound basis to assume Mr. Colton would have also posted digital media evidence online, especially when the affiant knew Mr. Colton did not have any such accounts.  Second, the affiant's statements does not include any explanation as to how posting on social media leads to digital evidence being transferred from a phone to other devices.  The statement simply concludes that based on the fact that other individuals posted on social media, there is probable cause to assume that digital media could have been transferred to other devices. This statement is misleading because posting on social media has no bearing on photos or videos being transferred to other devices. When a user posts on social media, the media they post is only uploaded online, it is not transferred or stored on any other digital device such as a home computer.

The fact that the affidavit inaccurately described Mr. Colton's behavior on the body camera as involving an assault is likely to have had an impact on the U.S. Magistrate Judge's evaluation of staleness.  As the Ninth Circuit explained in *Greany, supra*, staleness is evaluated in light of the particular facts of the crime and a simple trespass is very different from a felony obstruction of justice.

1
2

**C. The Affidavit is Only Supported by Wholly Conclusory Statements and Boilerplate Assertions Instead of Specific Facts Which Does Not Meet the Standard for Probable Cause.**

3
4
5
6
7
8
9
10
11
12

Even if the affiant's statements are presumed true, they still are not a sufficient basis to find probable cause. The statements are generalized boilerplate assertions that do not have any factual specificity to Mr. Colton's actions. A district court in the Central District of California reached the conclusion that such generalized statements are insufficient to support a finding of probable cause because they say nothing about the Defendant's conduct. *In re Search Warrant for the Prop. Located at Irvine Cal*. 2024 U.S. Dist. LEXIS 91322 (finding in a January 6th trespass charge, where nearly identical statements of probable cause about backing up data being common and the existence of syncing services, were found to be too tenuous to support a finding of probable cause to search all the defendant's devices). See: Ex. M: Suppression order.

13
14
15
16
17
18
19
20
21
22

In *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990), the Ninth Circuit held that warrants must not be based on multiple layers of interferences regarding groups of people and "rambling" boilerplate assertions, because while each inference alone may be reasonable, "with each succeeding inference, the last reached is less and less likely to be true. *See also United States v. Underwood*, 725 F.3d 1076, 1084 (9th Cir. 2013) (affirming that warrant was not based on probable cause because it lacked underlying facts that the issuing judge may use to evaluate the affiant's reasoning or to draw his or her own inferences and was instead dependent on "too many inferences").

23
24
25
26
27
28

The Ninth Circuit has held that probable cause to believe a person has an item does not give probable cause to believe "probable cause to believe that some incriminating evidence will be present at a particular place does not necessarily mean there is probable cause to believe that there will be more of the same." *U.S. v. Nora*, 765 F.3d 1049, 1060 (9th Cir. 2014). In *Nora*, the Ninth Circuit held that where a felon was seen carrying with a blue steel semiautomatic firearm

-15-

on his person as he entered a house there was no probable cause to search his home for other firearms. *Id.*

The probable cause statement, in essence, alleges that because Mr. Colton's computer had the capability to store a backup of his phone, probable cause exists to search it. However, the Ninth Circuit has found that bare capability to contain evidence is not sufficient to establish probable cause. In *United States v. Giberson*, law enforcement executed a search warrant for documents related to fake identification cards. *United States v. Giberson*, 527 F.3d 882 (9th Cir. 2008). In the defendant's house, the officers discovered a computer, which was not specifically mentioned in the search warrant. *Id.* Next to the computer was a printer, a sheet of fake I.D. cards, transparencies of the State Seal, and other documents related to producing false I.D.s such as social security cards and birth certificates. *Id.* The court found that these documents being around the computer established a sufficient nexus to search the computer. *Id.*

In contrast, in *United States v. Payton* law enforcement executed a search warrant to find documents related to drug sales, specifically looking for financial records such as pay/owe sheets. *United States v. Payton* 573 F.3d 859, 864 (9th Cir. 2009). Similar to *Giberson*, the officers searched and seized a computer in the defendant's house, even though the search warrant did not explicitly authorize the search of any computers. *Id.* The court found this search was unreasonable because there were no specific facts or indicia that the computer would contain evidence of drug sales, contrasting it with situation in *Giberson*. *Id.* The court specifically noted that though such financial records were physically capable of being kept on the computer, bare capability was not enough to render the search reasonable. *Id.* The Ninth Circuit emphasized that the specific indicia of the false identification documents and printer being found around the computer in *Giberson* that rendered the search reasonable, not the bare capability that the computer could contain the evidence sought by law enforcement. *Id.* *Payton* is analogous to Mr.

Colton's case, because the only support for probable cause was the affiant's statement that computers have a similar "bare capability" to store a backup of digital media from a phone. The affidavit does not mention any specific facts that he believes made it probable that Mr. Colton backed up his phone to any personal computer that he might have owned.

Moreover, before the warrant on Mr. Colton's house was executed there was no evidence to suggest that Mr. Colton even owned a computer or other digital device. In *United States v. Griffith*, the D.C. Circuit vacated a conviction holding a search warrant for an electronic device requires probable cause to believe the person owns such a device and that the device has evidence of a crime on it. *United States v. Griffith*, 867 F.3d 1265, 1276, 432 U.S.App.D.C. 234, 245 (D.C. Cir. 2017). In *Griffith*, the D.C. Circuit held that that fact that most people own cell phones was not enough to support the interference that a homicide suspect would probably have a cellular phone in his residence with evidence on it. *Id.,* at 1272. In this case, while there was evidence that Mr. Colton's cellular phone might still have evidence on it, there was nothing but speculation by law enforcement that Mr. Colton owned a computer or other electronic device, let alone that he backed up digital media onto that device. The D.C. Court found that authorizing a search based only on a generalization that most people own an electronic device, "would verge on authorizing a search of a person's home almost anytime there is probable cause to suspect her of a crime" in general. *Id.*

In *Griffith*, the D.C. Circuit also held that a search warrant for computer's contents was unlawful where there was no evidence that the   target of the search owned a computer:

> The application also referenced electronic devices apart from cell phones, including computers, tablets, and personal digital assistants. Again, though, the affidavit provided no reason to suppose that Griffith possessed any of those devices or that any would be found in the apartment. And although we give a "commonsense" rather than "hypertechnical" reading to a warrant application, Gates, 462 U.S. at 236, 103 S.Ct. 2317 (internal quotation marks omitted), there is no commonsense reason simply to presume that individuals own a computer or tablet. Those sorts of devices do not approach cellphones in their ubiquity:

whereas the Supreme Court, around the time of the warrant application in this case, observed that "more than 90% of American adults ... own a cell phone," *Riley v. California*, —— U.S. ——, 134 S.Ct. 2473, 2490, 189 L.Ed.2d 430 (2014), the same organization cited by the Court for that measure estimated the contemporaneous incidence of tablet ownership among adults at roughly 30% (2013), and of computer ownership at roughly 75% (2015), see Technology Device Ownership: 2015, Pew Research Center (Oct. 29, 2015), http://www.pewinternet.org/2015/10/29/technology-device-ownership-2015.

*United States v. Griffith, supra*, at 1272.

The affiant's use of his training and experience to support his conclusions about backing up files was misleading because it suggests his knowledge is similar to law enforcement officers who are able to give opinions about certain types of criminals based on the investigator's experience with high volumes of similar cases with common patterns of behavior.  As a limitation to such statements, the Ninth Circuit requires that "if the government presents an expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class." *United States v. Weber* 923 F.2d 1338 (1990). The affiant in Mr. Colton's case did not talk about any class of people but about people in general and this is not expert testimony and the magistrate should not have relied on it at all.

### D.  Motion for a *Franks* Hearing

To prevail on a *Franks* challenge to the veracity of the affidavit and the validity of the warrant, the defendant must ultimately establish by a preponderance of the evidence: (1) that the affiant intentionally or recklessly made false or misleading statements or omissions in support of the warrant; and (2) that the false or misleading statement or omission was material, that is, it was necessary to the finding of probable cause. *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017); *see also Franks v. Delaware*, 438 U.S. 154 (1978).  If the defendant satisfies both requirements, "the search warrant must be voided and the fruits of the search excluded."

*Perkins*, 850 F.3d at 1116.  A defendant is entitled to an evidentiary hearing if he:

> "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."

*United States v. Craighead*, 539 F.3d 1073, 1080–81 (9th Cir. 2008) (quoting *Franks*, 438 U.S. at 155–56); *see also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).  In *Chism v. Washington State*, 661 F.3d 380, 388 (9th Cir. 2011), the Ninth Circuit held that:

> The most commonsense evidence that the officers acted with at least a reckless disregard for the truth is that the omissions and false statements contained in the affidavit were all facts that were within [the affiant's] personal knowledge.

*Chism, supra*.

In Mr. Colton's case, the fact that the officer's misled the U.S. Magistrate by inaccurately describing his conduct as being involved in a physical assault was an intentional or at least reckless error in the affidavit.  Review of the video shows Mr. Colton was not involved in any physical assault and merely tried to protect himself from getting hit by the flag pole being swung around.  See Ex. L.  Although the affidavit did provide evidence of misdemeanor trespass inside the Capitol, the magistrate judge's evaluation of staleness depended on the type of crime being investigated.  The F.B.I. is a law enforcement agency tasked with investigating felony civil disorders in violation of 18 U.S.C. § 231, but the F.B.I. are not specialists in investigating misdemeanor offenses such as disorderly conduct and trespass.  Under 18 U.S.C. § 3501, Congress gave F.B.I. agents authority to make arrests for all federal felony offenses, but only the power to arrest for misdemeanors committed in the agent's presence.  Since the F.B.I. do not police federal buildings or lands, it is virtually certain that this agent never caught anyone in the act of committing a federal trespass or disorderly conduct and probably never investigated any disorderly conduct or trespassing offenses prior to being tasked with the January 6th investigation of Mr. Colton.  The affiant's alleged "training and experience" with this sort of "people" in this

sort of crime was certainly minimal and not sufficient to be given the expert weight that is routinely given for federal agents who are submitting affidavits in support of search warrants within their agency's core area of expertise.

### E.  The Good Faith Exception Does Not Apply.

The U.S. Attorneys for the Eastern District of California should have known that probable cause to search a person's phone does not give probable cause to search his computers in his residence, because in 2018, the Honorable Dale A. Drozd granted a motion to suppress a search of computers under a warrant that was supported by probable cause to believe only that the suspect's phone might contain photographs which the victim claimed to have seen Kastis take, but no evidence of probable cause to believe that Kastis' home computers  would contain any evidence.  *See United States v. Dimitrios Kastis,* 1:08-cr-00260-DAD-BAM ECF 121 at page 17. Order Granting Suppression. Ex. P: Order.   In this Order, the Court explained that "At most, perhaps, a warrant conceivably could have been issued for the candy bowl, a digital camera, and the photo of CV2 in her bathing suit." *Id.*

The U.S. Attorneys for the District of Columbia should have known that a search warrant for a computer's contents needed to supported by evidence that the suspect owned a computer, because the D.C. Circuit had struck down a similar warrant for a computer which was not based on any evidence that the suspect owned a computer. *See United States v. Griffith*, 867 F.3d 1265, 1276 (D.C. Cir. 2017).  Since the U.S. Attorney's from both the district of the investigation and the district where the evidence was sought bought should have been aware of precedents which had invalidated similar computer warrants the prosecution team cannot have had good faith in the probable cause statement in this affidavit.

For the good faith exception to apply, "the officer's affidavit must establish at least a

colorable argument for probable cause. *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006).  This standard is met if the affidavit provides evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." *Leon* 468 U.S. at 926.

The officer's material omissions and false descriptions of the acts which allegedly supported the probable cause for the only felony are inconsistent with a good faith belief that the warrant contained sufficient probable cause. *See United States v. Vigeant*, 176 F.3d 565, 572 (1st Cir. 1999)(a finding of good faith is inconsistent with numerous material omissions and false and misleading statements).

In sum, the statements in the affidavit of probable cause are stale, misleading, overgeneralized, and do not form a sufficient nexus between Mr. Colton's alleged trespass and his personal computer in his residence. There is nothing in the affidavit, therefore, to support even a "colorable" argument for probable cause. For the foregoing reasons, Defense requests the Court suppress all evidence seized in the search of Mr. Colton's home computers and devices.

Respectfully submitted,

Dated: June 28, 2024     HEATHER E. WILLIAMS
Federal Defender

*/s/ Douglas J. Beevers*
DOUGLAS J. BEEVERS
Assistant Federal Defender
Attorney for KYLE COLTON